We are challenging the 11th Administrative Review of Activated Carbon from China, anti-dumping duty order. This appeal involves commerce making a premeditated selection of Malaysia as its primary surrogate country, and then thwarting selection of the superior choice, which was Romania. Besides surrogate country selection, we are also challenging surrogate values for coal tar, pitch, and bituminous coal. I will start with the SPs, as commerce should have done per its policy, under which a comparative analysis of surrogate values across potential surrogate countries is necessarily preconditioned before a primary surrogate country is selected, and not the other way around. Let me start with coal tar pitch. What is coal tar pitch? Coal tar is a by-product during production of coke. Coal tar is then further distilled, and during distillation, it already contains 60% pitch and 40% of the products. During distillation, other products keep on falling, and pitch content keeps on rising. At the end of this process, you get pure pitch, which is 100% pitch. So coal tar and pitch, these form the two bookends of this pitch spectrum or distillation spectrum. Our input is coal tar pitch, which falls somewhere here in this spectrum. It is above 60%, but less than 100%. Let's see the HDS options. 2706 covers both coal tar and partially distilled tar. So 2706 straddles through the entire spectrum and ends just before the final point where you have the pure pitch, which is covered under 270810. But what Commerce did, it focused on a truncated description of 2706. It entirely eviscerated partially distilled tar, and considered only coal tar to belong to 2706. And then it said that coal tar pitch in common carbons is also known as pitch, and therefore coal tar pitch is pitch. And CIT also said that it brought distillation as a strawman and said both coal tar pitch and pitch, both are being produced by the same distillation process, so they are one and the same. This is totally wrong, this approach is totally wrong. Why it is wrong? It ignores the essential character of the input, which is partially distilled tar, not pitch. It misapplies the truncated description of 2706, as I said, because it eviscerates partially distilled tar from the equation. It improperly relies on common parlance nomenclature of the input, which is incorrectly often called pitch, whereas it is a partially distilled coal tar. And finally, it contradicts Commerce's own prior precedent from POR10, immediately prior review, where it classified the identical input under 2706. Now, so we are properly, the heading is 2706. Now, when we are in Malaysia, the 2706 surrogate value is anomalous, unreliable, because why it is anomalous, and that is why Commerce itself jettisoned it between preliminary and final, because the coal tar price, which is the raw material price, it is inverted. It is higher than the price of the finished goods pitch. And this inversion or anomalies brought to start, it is clear, because both imports under both headings are coming from the common sources, so you cannot make the argument, no, it were coming from different sources, so it could have been, you know, inversion could have been on account of that factor. So that is so far as coal tar. Next. Before you move on, there is a lot of arguments here, it is hard for me to keep track, but I think a lot, if not all of what you have said, the government is saying you did not exhaust below and you forfeited at least some of that. Do you agree with that? No, no, we do not agree. And the court brought in Boomerang in this equation. Our situation is not covered by Boomerang. Why? Because it is covered by ABB, another decision of this court in 2019, to which Judge Stoll authored that decision. Boomerang here does not apply, because Commerce de facto did not use 270810 in the prelims. And second, it gave a very confusing preliminary results where it said that it was going to Did you argue below that 270810 would be unreliable and anomalous because of the prevalence of Spanish imports? Yes, yes. Can you tell me where you argued that? That argument was not made before the court. It was or was not? It was not. And we were not required to exhaust it, because that heading was not used in the prelims. And it was laid out in a very confusing manner. Which is the fact situation which was what happened in ABB also. There also the department changed its practice between prelims and finals, just as department changed its practice here between prelims and finals from 2706, which was consistently being used historically, to a new heading in the final 270810. And the department gave a very confusing finding. It did not put us on notice. And none of the parties briefed this issue. None of the petitioners did not say you valued under 270810. So this came up for the first time in the final results. And therefore we were never required to exhaust under ABB. I will now go to bituminous coal. Again, the department improperly valued both categories of bituminous coal. For unknown heat value coal, it speculated and misclassified under Romanian 270112. 270112 covers bituminous coal, but only with heat value equal to or exceeding 5833 kilocalories per kg. Now, if it is an unknown heat value coal, equal probability principle says that it could be either above 5833 or below 5833. But the department made a presumption based on common parlance, the same mistake, that because the name matches, it eviscerated once again node 2 out of the equation, looked only narrowly at the description against 270112 and said, your input in common parlance is called bituminous coal. This heading, narrowly looked at, is also bituminous coal. So it tried to fit it right there. This was totally wrong. I want to ask you a question, just to make sure I'm clear. For the last issue discussed, which was the chart pitch and whether it was class, under the right classification, that's reviewed for substantial evidence, right? Yes. Okay. And the issue you're discussing now, that's also reviewed for substantial evidence, right? Yes. Yes. Okay. And it's your view, of course, that there isn't substantial evidence to support Commerce's determination. No, because Commerce unlawfully made, ultimately on both the issues, coal tar pitch and bituminous coal, there are some common themes here. You're focusing improperly on common parlance against what this CIT had expressly warned in AR 10, don't be misled by common parlance name of the input. And then you are ignoring the essential character of the input. And on the HDS side, you are making two mistakes. You are looking at a truncated description of 2706 in one instance and 270112 in case of bituminous coal. And then you are missing one important thing. This is a case of duality. If you have to properly value coal tar pitch, you have to look simultaneously at 2706 and 270810. Likewise, for bituminous coal, you have to simultaneously view 270112 and 270119. If you start viewing them in isolation, you are going to make the mistakes. Common mistakes have been made in both the cases. Had they looked together at the description for coal tar pitch at 2706 and 270810, they would have realized that 270810 covers only pitch from coal tar and other sources. And partially distilled coal tar cannot be simultaneously classified under both these headings. And partially distilled coal tar, expressly mentioned, is a term under 2706. So you could not have gone wrong. They would have reached the right decision. On bituminous coal side also, bituminous coal under 270112 is qualified by heat value. So it is bisected. The lower heat value, bituminous coal falls automatically under 270119. So when it is an unknown heat value coal, you do not know the heat value. That does not mean it does not have heat value. You only do not know. It could be either above or below. So higher heat value, you fit under 270112. Lower heat value, you fit under 270119. And then you average the two. That is how you get the proper valuation for unknown heat value coal. And why isn't that just a factual argument that Congress worked through and the way they resolved it is supported by substantial evidence? Yes. It is a question of substantial evidence because Congress removed node 2, which is integrally appended to 270112 out of this equation. Commerce did not look at it. Commerce said that no, 270112 description is bituminous coal. Your input is known as bituminous coal. And we do not know heat value as if heat value does not exist. And they tried to fit it right there, 270112. So one of the cases which I thought I will be asked so I will be able to distinguish, but I will go ahead right now. That case is mid-continent that there is a very important distinction with that case. But I will proceed ahead for now. For lower heat value coal, commerce went in a wrong direction. It picked the right heading, 270119, but then it selected the wrong country, Malaysia, as if Malaysia was already the primary surrogate country. It was not. You have to first evaluate the surrogate values of key inputs and then you have to pick up the surrogate country. By selecting Malaysia, commerce ended up valuing two grades of the same input in two different countries. It brought a distortion. You cannot value, I do not know of another case where commerce has valued two grades of the same input in two different countries when it had the HTS for both grades in Romania. So it should have stayed in Romania. But the fundamental mistake for why all this is happening, because commerce fixated itself, commerce chained itself in Malaysia to begin with. It started to thwart Romania first on significant production aspects during the final results itself. And even when it was remanded, consistently on one pretext or the other, commerce tried to stay locked in Malaysia. And from that standpoint, it was viewing all the surrogate value choices. Unless you give me a reason to move out of Malaysia, I am not going out of Malaysia. That was a fundamental mistake. So it was doing the sequential analysis in a backward way, which was against commerce's own policy, where you have to first evaluate data quality and then pick up the primary surrogate country. Now, in this case, I am finally taking a primary surrogate country selection. It is evaluated based on the surrogate value of key input and financial ratios. Commerce has acknowledged that it can value bituminous coal. It needs Romanian data for financial ratios. They have to use Rome carbon from Malaysia. So for these two inputs, which account— You're into your rebuttal time. Would you like to say that? Yeah, I'll— You can keep going, but— I'll proceed very fast. So it is clear that based on these two inputs, they had to stay in Romania. They did not do so, so they violated their own policy. I'm going to reserve the rest of my time for rebuttal. Good morning, Your Honors, and may it please the Court. When commerce set about to construct the normal value of the merchandise that was under review here, it first selected a surrogate country, which was Malaysia, and there's substantial evidence that supports that decision. Most of Appellant's arguments here reflect a simple disagreement with that exercise of discretion, disagreeing that Malaysia was the correct country to choose and that instead Romania or, in some cases, Russia would have been the better choice. But I don't hear any arguments that commerce's decision was not supported by substantial evidence, and in the absence of that, Appellant's arguments here don't undermine the substantial evidence standard and do not disturb commerce's findings. The finding of Malaysia was based on product specificity and contemporaneous data with the period of review. And once chosen, then commerce looked to Malaysian data sets in order to construct the surrogate values to value the inputs that would go into the factors of production for valuing the subject merchandise. And here, there are two factors of production, I'm sorry, there are two inputs that Appellant challenges. But all of these challenges, again, come down to disagreements with commerce's exercise of discretion and how it chooses to value these inputs. Commerce's strong preference, which is exercised here, was to stick with the primary surrogate country, Malaysia, when they're looking at data sets, and only depart from that and look to their secondary surrogate country, which was Romania, in this case, when data was not available or couldn't be relied on from Malaysia. A number of arguments have been raised about the reliability of Malaysian data in certain data sets with respect to Petunias Coals, as well as coal tar pitch, to the extent those arguments have not been exhausted. They shouldn't be raised here, but I'll just address them in their substance. There is nothing on this record that Appellants have pointed to to say that the Malaysian data, which has been found to be reliable, is not reliable or it's aberrational. When commerce engages in that sort of an inquiry, there's a benchmarking analysis that it undertakes. It compares historical import data for a potential surrogate country, or it looks at data from the same classification over years. There's no such evidence on this record that would allow commerce to make that determination with respect to the specific data sets that Appellants are challenging here. With respect specifically to the Petunias Coal input, Appellants raised a number of arguments about how the heat values could have been constructed or how they should have been measured. But it's undisputed that there were inputs that had known heat values, and then there were inputs that had unknown heat values. For the unknown heat values, Commerce was left to evaluate that input using its best available data and relied on the respondent's own representations about what those inputs were. I might have misunderstood you. I think you meant there were some inputs with known heat value and some with unknown heat value. That's correct. And for the unknown, Appellants challenged the classification for both, but specifically with respect to the unknown heat value. The arguments that Appellants are raising now are simply attorney arguments about how one can look to heat value and the content of those inputs. None of that's on the record. None of that was before Commerce because they could not identify what these heat values were. And the respondents who would have been responsible for creating this record and telling Commerce what those heat values were did not provide test reports that allowed Commerce to make that determination. So instead, Commerce relied on those respondents' own description of the input, which they described as, in numerous places, bituminous coal. And bituminous coal matches the description under heading 2701.12 for that particular input. Commerce is entitled to rely on the plain language of descriptions provided by respondents as well as classifications and where those appear. And I would just like to briefly address, as I suspect my friend on the other side will in his rebuttal, the argument that there may not have been an opportunity or Commerce did not provide a notice and an opportunity to cure any deficiencies that were later identified by the respondents in this petition. And they seek to apply the standard under Section 1677M. That section applies only to instances where Commerce issues a request for information to respondents, or submits information, and there is a deficiency with the information that is provided. In those circumstances, Commerce is under a duty to notify the respondent and provide an opportunity to cure. That section has no applicability here when we're talking about surrogate values and the construction of surrogate values. This Court has decided in 2014 in Marvin Furniture that 1677M only applies when there is an actual request for information and a response. Surrogate value constructions are done on a voluntary basis by a number of parties who on their own initiative take it upon themselves to submit such information. So Commerce is under no duty to notify or allow deficient information to be cured, nor is there any reason for Commerce to believe that the information that's provided was in fact deficient. This is, I think, the 11th administrative review, and some of the decisions Commerce made here seem to be different from what they've done in earlier administrative reviews. Is there any obligation on Commerce's part to explain why it's viewing some of the very  Commerce has reached different conclusions in this review as it had in prior reviews on certain issues, but the duty to explain differences only arises if Commerce is looking at the same record, the same facts before it, and applying a different methodology and reaching a different conclusion. But there hasn't been any argument here that the evidence on this record was in fact the same as the evidence before Commerce in AR 10 or 2 or 4. And in fact, as we look back across among the different reviews that are undertaken, Commerce has reached conclusions that are similar to what it reached in 11 and also different. So it goes both ways. And the reason is because the respondents who are obligated to respond to Commerce's questionnaires, and they're also obligated to create the record, have put different evidence on the record supporting the inputs that they produce and the surrogate values that they would like to see used. And that is what Commerce relies on in reaching its conclusions. So in the coal tar pitch issue, for example, when a mandatory respondent says, we use coal tar pitch. This is what it is. This is how it's produced. Commerce relies on that in determining how that value is going to be calculated or assigned under the different classification headings. In another review, a different respondent, or even maybe the same respondent, could put different evidence on the record describing what that input is. And so a different determination could be reached. There wasn't anything in the briefing here, there wasn't any argument made that the same evidence was presented in prior reviews and Commerce changed its methodology or reached a different conclusion on the basis of the same facts. That is just not the case that we have here. So we will get this anew. And so if there are no further questions from the panel, I will cede the remainder of my time, if I might, to interveners. I respectfully request that this Court uphold the decision of the Court of International Trade and sustain Commerce's final results. Thank you. Ms. Brewer, it looks like you have about six minutes. I think we understand what the government is saying, so if you could avoid repeating what they just said, that would be helpful. If you have anything additional to add, feel free. Yes, Your Honor. Thank you. May it please the Court. I won't repeat arguments. I wanted to just chime in on Appellant's argument that 1677MD applies as a legal matter here. We made the point in our response brief that there was no support provided in Appellant's opening brief to support that argument. And in response, in their reply brief, they've cited to a couple of items that I'd like to quickly address. This is on page 23 of their reply brief. They first cite to the Hitachi Energy case that was issued by this Court last year. That case involved a Korean respondent reporting pertaining to its U.S. sales and certain revenues that were associated with its U.S. sales. So that was a response to information provided in a questionnaire response, not in the surrogate value context, quite different than what we're looking at here. In the Shelter Forest case, which is a non-presidential decision from this Court, it pertained to the question of whether 1677MD applies in the context of responses provided by a voluntary respondent, not a mandatory respondent. Again, not a case that occurred in the context of surrogate values. So neither of those cases applies here. And then finally, at the top of page 23 of their brief, Appellant cite to a seamless refined copper-type tube case from the Commerce Department to argue that Commerce routinely issues supplemental surrogate value questionnaires in its proceedings. But if you look at what plaintiffs are citing there, it's actually supplemental questionnaires about the respondent's factors of production and not the surrogate value information that they submitted. So again, a distinguishable case. So it's our position that at this point that argument from the appellants remains unsupported without any legal authority. Thank you. Mr. Chaudhary, you have about two and a half minutes left. I will start with the request for information. This is a Chevron issue. 1677MD speaks about request for information. There are five enumerated categories of information, factual information in regulations. One of them is about surrogate values. Now, the fact, my friend was mentioning that in the copper-type case, actually I worked on that case, the department issued four supplementals, specifically on surrogate value, not on shops, as she just said. Now, it has become very common for the department to keep issuing surrogate value-specific supplementals in every case I am working on these days. So the department, it is a request for information. It is not like Marvin's case where it was a New Shipper Review application made on a voluntary basis. No. These information are being solicited specifically at 294-295 in the appendix. The letter from Commerce at 294-295 appendix, it specifically calls for, in response to that letter, we provided that information. And therefore, to say that Commerce was not obligated to issue deficiency letters if it felt that our data was not contemporaneous has no merit. Moreover, this argument is completely disingenuous because Commerce actually used our Romanian data in prelim results and credited also in a footnote that we are using the data submitted by the respondents. For the first time, they had a revelation during final demand that this whole Romanian data is from three years and they came up with some goofy explanation which has absolutely no merit. I don't have time. Otherwise, I would have explained it. But basically, this total Romanian data is fully contemporaneous. Everyone knows about it. So they are just trying to oust Romania with one broad brush, some sweeping explanation. For example, this specificity that Malaysia alone has coconut shell charcoal data. This honorable quote in Jacobi Carbon's AR4 case determined that 4402 heading is the proper heading for valuing coal-based carbonized material, which is the main input. And only Romania has that data on this record. So if you consider financial ratios, bituminous coal, and coal-based carbonized material, these three inputs in the aggregate account for more than 50% normal value for both the respondents and for which the quality data, reliable data, or actually the data, usable data itself is only in Romania, not in Malaysia. So there is no question that Malaysia is an improper choice Commerce made. And just at every possible step, it came up with... We're out of time. We have your argument. Thank you. Thank you.